# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

## No. 15-3810

STEVEN J. TRZASKA,

Appellant,

v.

L'ORÉAL USA, INC. and L'ORÉAL, S.A.,

Appellees.

## BRIEF FOR APPELLANT AND VOLUME I OF THE APPENDIX[*]

On Appeal from the October 30, 2015 Order of the United States District Court for the District of New Jersey in Civil Action No. 2:15-CV- 2713 dismissing plaintiff Steven J. Trzaska's First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

RAYNES McCARTY
By:    Harold I. Goodman, Esquire
        Daniel Bencivenga, Esquire
1845 Walnut Street, 20th Floor
Philadelphia, Pennsylvania 19103
215-568-6190

*Attorneys for Plaintiff-Appellant Steven J. Trzaska*

---

[*] In Appellant's public filings, portions of the Brief for Appellant and Volume II of the Appendix have been redacted to accord with this Court's Order of May 6, 2016. Appellant has separately filed under seal complete copies of his Brief and Volumes I and II of the Appendix.

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................. iii

Statement of Jurisdiction ........................................................ 1

Statement of Issues Presented for Review ............................... 3

Statement of Related Cases and Proceedings ........................... 4

Statement of the Case .............................................................. 5

    i.    L'Oréal's Patent Application Process ......................... 7

    ii.    L'Oréal's 2014 Patent Quota and
        Mr. Trzaska's Termination ....................................... 8

Statement of the Scope and Standard of Review ...................... 14

Summary of Argument ............................................................. 15

Argument ................................................................................ 19

    I.    Rules of Professional Conduct Governing the Practice
        of Law, Specifically the Rules Governing the Practice
        of Law By Patent Lawyers, Provide a Source of Public
        Policy Enabling In-House Lawyer Employees to Sue
        Their Employers for Retaliation Under New Jersey's
        Conscientious Employee Protection Act ...................... 19

        A.    The Rules of Professional Conduct Relating to
            Patent Practice ................................................. 23

        B.    New Jersey CEPA Statute ................................. 27

        C.    The Caselaw Construing the CEPA Statute ........ 31

i

**Page**

II.    Plaintiff's Amended Complaint States a Valid CEPA
Claim for Retaliatory Discharge................................................... 36

A.    The Standard Is Not Whether an Employer
Has Committed an Actual Violation of Law or
Public Policy, But Whether a CEPA Plaintiff
Has Shown a Reasonable Belief That a Violation
Has Occurred..................................................................... 37

B.    The Factual Allegations Pled in Plaintiff's Amended
Complaint Amply Satisfy CEPA's Reasonable
Belief Standard.................................................................. 39

Conclusion............................................................................................. 45

Certification of Compliance with Filing Requirements..................... 46

Volume I of the Appendix

Certificate of Service

# TABLE OF AUTHORITIES

## CASES                                                                    Page(s)

*Abbamont v. Piscataway Twp. Bd. of Educ.*,
650 A.2d 958 (N.J. 1994) ................................................................. 30

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................................................................... 36

*Baldwin v. City of Atlantic City*,
2015 WL 5009746 (N.J. Super. App. Div. Aug. 19, 2015) ............................ 35

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ....................................................................... 36

*Blackburn v. United Parcel Service, Inc.*,
179 F.3d 81 (3d Cir. 1999) ............................................................... 39

*Burkhart v. Semitool, Inc.*,
5 P.3d 1031 (Mont. 2000) ................................................................ 33

*Clark v. United States*,
289 U.S. 1 ................................................................................. 32

*Connelly v. Lane Const. Corp.*,
809 F.3d 780 (3d Cir. 2016) ............................................................. 14

*Dzwonar v. McDevitt*,
828 A.2d 893 (N.J. 2003) ................................................................ 38

*Estate of Roach v. TRW, Inc.*,
754 A.2d 544 (N.J. 2000) ................................................................ 29-
30, 34-35,
37-38, 39

iii

**Page(s)**

*Foglia v. Renal Ventures Mgmt., LLC,*
754 F.3d 153 (3d Cir. 2014) .......................................................... 14,
17, 36

*Hitesman v. Bridgeway, Inc.,*
93 A.3d 306 (N.J. 2014) ................................................................ 35,
37-38

*Jordan v. Fox, Rothschild, O'Brien & Frankel,*
20 F.3d 1250 (3d Cir. 1994) .......................................................... 14

*Kachmar v. Sungard Data Systems, Inc.,*
109 F.3d 173 (3d Cir. 1997) .......................................................... 32-33

*Kingsland v. Dorsey,*
338 U.S. 318 (1949) ...................................................................... 21

*Life Techs., Inc. v. Clontech Labs., Inc.,*
224 F.3d 1320 (Fed. Cir. 2000)...................................................... 20

*Lippman v. Ethicon, Inc.,*
119 A.3d 215 (N.J. 2015) .............................................................. 16,
29, 31, 33-34

*Mazza v. George Yelland,* Inc.,
161 F. Supp. 2d 376 (D.N.J. 2001) ................................................ 38-39

*Mehlman v. Mobil Oil Corp.,*
707 A.2d 1000 (N.J. 1998) ............................................................ 28-29

*Molins PLC v. Textron, Inc.,*
48 F.3d 1172 (Fed. Cir. 1995) ....................................................... 20, 26

*Morris v. Greitzer and Locks of New Jersey,*
2009 WL 2525452 (N.J. Super. App. Div. Aug. 20, 2009) ............ 35, 38

iv

**Page(s)**

*Parker v. M&T Chemicals, Inc.*,
566 A.2d 215 (N.J. Super. App. Div. 1989) .................................... 16,
28-29, 31-35

*Phillips v. City of Allegheny*,
515 F.3d 224 (3d Cir. 2008) ............................................ 36

*Pierce v. Ortho. Pharm. Corp.*,
417 A.2d 505 (N.J. 1980) ............................................. 23,
27-28, 35-36

*Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*,
324 U.S. 806 (1945) ................................................. 16,
20-21

*State v. Davis*,
840 A.2d 279 (N.J. Super. App. Div. 2004) .................................. 34

*Sunkett v. Misci*,
183 F. Supp. 2d 691 (D.N.J. 2002) .................................... 34

*Tartaglia v. UBS Painewebber, Inc.*,
961 A.2d 1167 (N.J. 2008) ......................................... 35-36

*Therasense, Inc. v. Becton, Dickinson & Co.*,
649 F.3d 1276 (Fed. Cir. 2011) ....................................... 21

*Thunberg v. Strause*,
682 A.2d 295 (Pa. 1996) ........................................... 22, 26

*Weiss v. Carpenter, Bennett & Morrison*,
672 A.2d 1132 (N.J. 1996) ........................................... 35

**Page(s)**

**FEDERAL REGULATIONS RELATING TO LEGAL PRACTICE
BEFORE THE UNITED STATES PATENT AND TRADEMARK OFFICE**

37 C.F.R. § 1.56 ................................................................. 5-6,
16, 20, 22, 23-24

37 C.F.R. § 11.18 ................................................................. 6,
24, 25

37 C.F.R. § 11.20 ................................................................. 6,
25-26, 27

37 C.F.R. § 11.113 ............................................................. 6, 20,
25, 27

37 C.F.R. § 11.201 ............................................................. 25

37 C.F.R. § 11.301 ................................................................. 6,
24, 26

37 C.F.R. § 11.303 ................................................................. 6,
24, 26

37 C.F.R. § 11.804 ............................................................. 6, 25,
26-27

**PENNSYLVANIA RULES OF PROFESSIONAL CONDUCT**

Pa.RPC Preamble [1] ......................................................... 16, 22

Pa.RPC 1.13 ......................................................................... 6, 27

Pa.RPC 3.1 ........................................................................... 6, 20,
26

**Page(s)**

Pa.RPC 3.3 ............................................................................ 6, 20
26

Pa.RPC 8.4 ............................................................................ 6,
26-27

Pa.R.D.E. 204 ....................................................................... 6, 27

**FEDERAL STATUTES**

18 U.S.C. § 1001 .................................................................. 24-25

28 U.S.C. § 1291 ................................................................... 2

28 U.S.C. § 1332 ................................................................... 1

**NEW JERSEY CONSCIENTIOUS EMPLOYEE PROTECTION ACT**

N.J.S.A., § 34:19-1 ............................................................... 1, 3
28

N.J.S.A., § 34:19-3a.(1) ....................................................... 30-
31, 37-38

N.J.S.A., § 34:19-3a.(2) ....................................................... 30-31

N.J.S.A., § 34:19-3c.(1) ....................................................... 30-
31, 37-38

N.J.S.A., § 34:19-3c.(2) ....................................................... 28,
30-31

N.J.S.A., § 34:19-3c.(3) ....................................................... 30-31

**Page(s)**

**RULES OF CIVIL PROCEDURE**

Fed.R.Civ.P. 12(b)(5) ........................................................ 1, 2

Fed.R.Civ.P. 12(b)(6) ........................................................ 1, 2
13, 14

**SECONDARY SOURCES**

Alex Long, "Retaliatory Discharge and the Ethical Rules
Governing Attorneys," 79 U.Colo. Law. Rev. 1043 (2008) .......................... 23

## STATEMENT OF JURISDICTION

Steven Trzaska, a patent attorney, brought this suit against his former employer L'Oréal USA, Inc. and its parent company, L'Oréal, S.A., for retaliatory discharge under New Jersey's Conscientious Employee Protection Act, N.J.S.A., § 34:19-1 *et seq.* ("CEPA"). The District Court had subject matter jurisdiction over the action based on the parties' diversity of citizenship pursuant to 28 U.S. C. § 1332.

On October 30, 2015, the District Court issued an Opinion dismissing Mr. Trzaska's First Amended Complaint against both L'Oréal defendants for failure to state a claim under Fed.R.Civ.P. 12(b)(6). App. Vol. I at 007-016. The Court issued two Orders in connection with its Opinion. In the first (from which Mr. Trzaska appealed), the District Court granted a motion by L'Oréal USA to dismiss Mr. Trzaska's Amended Complaint pursuant to Rule 12(b)(6). App. Vol. I at 004. By a separate Order issued the same day, it denied as "moot" a motion filed by L'Oréal, S.A. to dismiss Mr. Trzaska's claim under Rule 12(b)(5) for insufficient service of process. App. Vol. I at 005-006. However, even though L'Oréal, S.A. did not request relief under Rule 12(b)(6), the District Court's second Order dismissed Mr. Trzaska's claims against it on the same Rule 12(b)(6) grounds that it granted dismissal in favor of L'Oréal USA. *Id.*

1

On November 20, 2015, Mr. Trzaska timely noticed an appeal to this Court from the District Court's Rule 12(b)(6) Order as to L'Oréal USA.  App. Vol. I at 001-003.  As a final order, jurisdiction over that appeal is conferred on this Court by 28 U.S.C. § 1291.  Because L'Oréal, S.A. never moved for dismissal under Rule 12(b)(6), and because the District Court dismissed it on the same basis as it dismissed L'Oréal USA, Mr. Trzaska did not separately notice an appeal of the second Order denying L'Oréal, S.A.'s Rule 12(b)(5) motion as "moot."

Whether this Court has jurisdiction over the dismissal of L'Oréal, S.A. from the case is the subject of a pending motion to dismiss.  As set forth in detail in Mr. Trzaska's response to the motion of L'Oréal, S.A., given the substantive overlap between the orders dismissing both defendants -- both having been dismissed for the very same reason -- Mr. Trzaska was not required to separately notice an appeal of both orders in order to preserve his appellate rights against L'Oréal, S.A.

2

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     To what extent do the rules of professional conduct governing the practice of law provide a source of public policy enabling lawyers to bring retaliation suits against their employers under New Jersey's Conscientious Employee Protection Act?

2.     Does the New Jersey Conscientious Employee Protection Act provide a cause of action for an in-house lawyer who is fired in retaliation for his opposition to and refusal to participate in conduct by his employer that he reasonably believes is both unethical and unlawful?

## **STATEMENT OF RELATED CASES AND PROCEEDINGS**

This case has not been before this Court previously and Appellant Trzaska is unaware of any other case or proceeding that is in any way related, completed, pending or about to be presented before this Court or any other court or agencies, state or federal.

## STATEMENT OF THE CASE

This lawsuit stems from the December 2014 employment termination of Steven Trzaska by L'Oréal USA, Inc., the United States subsidiary of Paris-based L'Oréal, S.A., one of the largest cosmetics companies in the world.[1] (Unless otherwise indicated, references to "L'Oréal" are to both defendants.) As averred in his First Amended Complaint, Mr. Trzaska, a patent lawyer, was fired because he objected to and refused to draft and file patent applications for L'Oréal that he and his staff reasonably believed were not patentable. Am. Cmplt. at ¶¶65-67, App. Vol. II at 035-036.

At the time of his termination, Mr. Trzaska was the head of patents and business development for L'Oréal USA. Am. Cmplt. at ¶13, App. Vol. II at 026. As a patent attorney, Mr. Trzaska was admitted to practice both before the Supreme Court of Pennsylvania and the United States Patent and Trademark Office ("PTO"). Am. Cmplt. at ¶¶14, 15, App. Vol. II at 026-027. His practice before both bodies was circumscribed by a web of professional rules that governed his practice of law. Am. Cmplt. at ¶¶19-20, App. Vol. II at 027. Paramount among these was the requirement that Mr. Trzaska act with complete candor and good

---

[1]    *See* ¶¶27 and 64 of Mr. Trzaska's First Amended Complaint at App. Vol. II at 028, 035 (hereinafter "Am. Cmplt.").

faith in his relations with the PTO. *See* 37 C.F.R. § 1.56. To ensure this overarching duty was rigidly followed, the PTO enacted several augmenting regulations governing a practitioner's conduct. *See, e.g.,* 37 C.F.R. § 11.301 (relating to frivolous proceedings before the Office); 37 C.F.R. § 11.303 (relating to false statements to a tribunal); 37 C.F.R. § 11.18 (relating to false or fraudulent submissions to the Office); 37 C.F.R. § 11.113 (relating to the duty of candor for organizational attorneys); 37 C.F.R. § 11.804 (relating to professional misconduct by PTO practitioners). Violations of any of these rules subject a practitioner to a range of sanctions, including exclusion of practice before the PTO. *See* 37 C.F.R. § 11.20

Supplementing these PTO rules are analogous Rules of Professional Conduct that circumscribe Mr. Trzaska's practice as a Pennsylvania attorney. *See* Pa.RPC 3.1 (relating to frivolous proceedings); Pa.RPC 3.3 (relating to the duty of candor toward a tribunal); Pa.RPC 8.4 (relating to professional misconduct); Pa.RPC 1.13 (relating to representation of organizations). As with the PTO rules, violations of the Pennsylvania conduct rules carry stiff sanctions. *See* Pa.R.D.E. 204.

Throughout Mr. Trzaska's employment with L'Oréal USA, which began in 2004, L'Oréal, S.A. set an annual quota for the number of patents applications to

be filed by L'Oréal's international subsidiaries and related companies. For the years 2012 through 2014, the international quota for L'Oréal patent applications stood at 500. Am. Cmplt. at ¶¶21-24, App. Vol. II at 027-028.

This quota system was established by L'Oréal to bolster its reputation for scientific innovation with financial analysts, stockholders, and consumers. With $35 billion in annual sales, L'Oréal's reputation for innovation was critical to retaining its status as a world leader in the sales of cosmetics. Am. Cmplt. at ¶¶26-29, App. Vol. II at 028. Indeed, L'Oréal promoted the pendency of its patents on the packaging of its cosmetics products so that consumers would believe the products were innovative and effective. *Id.* at 28-29, App. Vol. II at 028.

### i.    L'Oréal's Patent Application Process

Though L'Oréal's patent application process would ultimately be subverted by the company's desire to boost the number of its patent applications, L'Oréal had in place a process to vet putative inventions from its worldwide group of subsidiaries. Through this process, claimed inventions were to be reviewed for patentability by local scientists and researchers, local patent teams, and by a committee of laboratory heads at L'Oréal, S.A. in Paris. Am. Cmplt. at ¶¶38-43, App. Vol. II at 031-032.

7

At the completion of this vetting process and before a patent application could be filed with the PTO, it was the legal and professional responsibility of L'Oréal's reviewing patent attorney or patent agent to make a good faith determination that the invention was patentable. Am. Cmplt. at ¶43, App. Vol. II at 032. It is this determination that is at the center of this lawsuit.

### ii.    L'Oréal's 2014 Patent Quota and Mr. Trzaska's Termination.

In 2014, an external review of L'Oréal's patents revealed that, notwithstanding L'Oréal's patent review process, many of its inventions were of low or poor quality. Am. Cmplt. at ¶¶48-50, App. Vol. II at 033. Thus began a push by L'Oréal to improve the quality of its patents, while at the same time rigidly adhering to the target numbers imposed by L'Oréal's patent quota regime. The incompatibility of these tandem goals would have dramatic consequences for Mr. Trzaska.

As noted above, in 2014 L'Oréal, S.A. set a quota of 500 patent applications for its international affiliates. For L'Oreal's Clark, New Jersey research facility -- where Mr. Trzaska worked and headed L'Oréal's local patent review team -- L'Oréal, S.A. established a quota of 40 patent applications. Am. Cmplt. at ¶¶25, 45, App. Vol. II at 028, 032. However, as of September 2014, only about 100

patent applications had been filed by L'Oréal's worldwide affiliates and fewer than 15 by L'Oréal USA.  Am. Cmplt. at ¶¶52, 53, App. Vol. II at 033.

Notwithstanding L'Oréal's professed desire to improve patent quality, it did not intend to sacrifice its patent quotas as a means of achieving that end.  Thus, during the third and fourth quarters of 2014, Mr. Trzaska and his patent group began receiving e-mails from L'Oréal management emphasizing that the quotas were in danger of not being met.  Am. Cmplt. at ¶51, App. Vol. II at 033.



For his part, and also in October 2014, Mr. Trzaska met to discuss the patent application quotas with Yoana Land, his supervisor at L'Oréal USA, and Jean Francois Pahin, the global CFO of the Research and Innovation organization of L'Oréal, S.A. As described in his Amended Complaint:

> During Plaintiff's meeting with CFO Pahin, Plaintiff advised that neither he nor the patent attorneys who reported to him were willing to file patent applications that the attorneys believed were not patentable (the subject matter of which at times was admitted to by the submitting inventors as not being patentable) solely for the purpose of meeting L'Oréal's Clark, NJ quota of forty (40) patent filings.

Am. Cmplt. at ¶57, App. Vol. II at 034 (emphasis added).

Just about two weeks after this meeting with CFO Pahin, Mr. Trzaska was summoned to a meeting with Diane Lewis, L'Oréal's Head of Human Resources for Research in the United States. Ms. Lewis informed Mr. Trzaska that she was aware of his meeting with CFO Pahin. And, in light of the Pahin meeting, Ms. Lewis told Mr. Trzaska that he had two options: he could either "get back to work" or he could leave his employment with L'Oréal with fifteen weeks of severance pay. As to Mr. Trzaska's ethical and legal concerns, Ms. Lewis said not a word. Am. Cmplt. at ¶58-60, App. Vol. II at 034-035.

Having heard from Ms. Lewis, Mr. Trzaska then requested a meeting with Sarah Hibberson, L'Oréal's Head of all Human Resources in the United States. While Ms. Hibberson indicated that she would look into the situation, Mr. Trzaska was instead channeled to Thomas Sarakatsannis, the General Counsel for L'Oréal USA, who bluntly told Mr. Trzaska that he would be terminated and provided with

11

a severance package of 40 weeks to leave the company. Am. Cmplt. at ¶61-63, App. Vol. II at 035.

Two weeks later, on December 8, 2014, at a meeting with Ms. Lewis and Stephan Habif (the architect of the "patent-a-thon" program), Mr. Trzaska was terminated without any severance. Am. Cmplt. at ¶64, App. Vol. II at 035. He was told his position was no longer needed and that he was being terminated "because he had threatened to begin legal actions if his concerns [with the L'Oréal patent system were not addressed]." *Id.*

In fact, Mr. Trzaska was fired in retaliation for his objection to, and refusal to participate in, L'Oréal's quota scheme which he reasonably believed to be a violation of the PTO regulations and the Pennsylvania Rules of Professional Conduct that governed his day-to-day practice of law. Am. Cmplt. at ¶¶65-67, App. Vol. II at 035-36. Specifically, he was fired "for his refusal to draft and file patent applications for proposed inventions which were not patentable." Am. Cmplt. at ¶65, App. Vol. II at 035. "His termination was also for his refusal to allow members of the patent team of which he was the head to draft and file patent applications for proposed inventions [that] were not patentable." *Id.* As an experienced patent lawyer, Mr. Trzaska reasonably believed that to engage in any such scheme, as prescribed by L'Oréal, was "fraudulent or criminal." Am. Cmplt.

at ¶67, App. Vol. II at 036.  Moreover, as averred by Mr. Trzaska, L'Oréal knew that its policies and practices were illegal. Am. Cmplt. at ¶73, App. Vol. II at 036.

As further evidence of pretext, just two or so weeks after Mr. Trzaska was fired, L'Oréal posted an advertisement for his position.  This demonstrated the falsity of L'Oréal's explanation that his job was no longer needed.  Am. Cmplt. at ¶68, App. Vol. at 036.

*      *      *

As noted, by Orders and Opinion dated October 30, 2015, the District Court dismissed Mr. Trzaska's First Amended Complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6), finding (a) that professional rules of conduct do not provide a source of authority for Mr. Trzaska's CEPA claim; and (b) in any event, his allegations evidenced  "nothing more than [Mr. Trzaska's] disagreement with his employer over the propriety of a quota for patent applications." App. Vol. I at 015.  Mr. Trzaska here appeals from the district court's dismissal of his claims.

## STATEMENT OF THE SCOPE AND STANDARD OF REVIEW

This Court exercises plenary review over a district court's dismissal of a complaint for failure to state a claim under Rule 12(b)(6). *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994). In considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the non-movant. *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (citations omitted). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The plausibility standard does not impose a probability requirement. It only requires a pleading to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 789. Moreover, a case should not be dismissed for failure to state a claim unless it clearly appears that no relief can be granted under any set of facts that could be proved consistently with the plaintiff's allegations. *Jordan, supra*, 20 F.3d at 1261.

14

## SUMMARY OF ARGUMENT

This case presents the question whether the Rules of Professional Conduct ("RPCs"), which undisputedly govern a lawyer's practice of law, also provide a source of authority enabling an in-house attorney to pursue claims of whistleblower retaliation against his or her employer under New Jersey's CEPA statute. As a second question, the Court must determine, based on the facts averred in his Amended Complaint, whether plaintiff Trzaska has sufficiently pled that he had a reasonable belief that defendant L'Oréal engaged in conduct that violated the law or a clear mandate of public policy.

The District Court answered both questions in the negative. As to the first, it concluded that "RPCs have no bearing on Defendant's business practices." App. Vol. I at 013. It went on to say, the RPCs only "exist as a benefit for patent attorneys and those admitted to the Pennsylvania bar -- they do not benefit the general public." *Id*. at 014 n.2. As to the second question, it concluded that "Plaintiff fail[ed] to demonstrate that he held a reasonable objective belief that Defendant's quota policy had, or would in the future, violate [*sic*] the RPCs or any other authority." *Id*. at 014.

Both answers were incorrect. The first was an error of law. Mr. Trzaska did not leave the RPCs at home when he went to work each day. As a L'Oréal patent

15

lawyer, he was bound, as was L'Oréal, to comply with the prescriptions and prohibitions the RPCs imposed on him in the performance of his duties. Moreover, the RPCs are not just precatory comments for the private use of patent lawyers and members of the Pennsylvania bar. Quite the contrary: As the Supreme Court held long ago: "The possession and assertion of patent rights are issues of great moment to the public." *Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 815 (1945) (internal quotation marks omitted). The PTO's regulations are to the same effect. 37 C.F.R. § 1.56(a) ("A patent by its very nature is affected with a public interest"). So too the Pennsylvania Rules of Professional Conduct require lawyers to not just act as client representatives, but also as "public citizen[s] having a special responsibility for the quality of justice." Pa. RPC Preamble [1]. Not surprisingly, therefore, New Jersey courts, cognizant of the public policies animating CEPA, have green-lighted code-driven retaliation suits by patent lawyers like Mr. Trzaska, see *Parker v. M&T Chemicals, Inc.*, 566 A.2d 215, 221 (N.J. Super. App. Div. 1989) ("We . . . will not read in-house attorneys out of the Act's protection") as well as by other "watchdog" employees like him. *Lippman v. Ethicon, Inc.*, 119 A.3d 215 (N.J. 2015). The District Court thus committed reversible error by holding that the RPCs do not provide a source of authority for Mr. Trzaska's CEPA claim.

16

It likewise erred by concluding that Mr. Trzaska failed to sufficiently plead that he had an objectively reasonable belief that L'Oréal's quota system, as applied, violated the law and a clear mandate of public policy. In that respect, the District Court failed to read the Amended Complaint in the light most favorable to Mr. Trzaska and to draw all reasonable inferences in his favor, as it was required to do. *Foglia v. Renal Ventures Mgt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014). Had it done so, it would and should have credited his allegations that he and his staff were required by L'Oréal to file patent applications with the PTO without regard to whether the underlying inventions were patentable; that to file patent applications without regard to the patentability of the underlying inventions was a breach of the duties they owed to the PTO and the ones he owed to the Supreme Court of Pennsylvania; that L'Oréal threatened him and his patent colleagues with dire consequences to their careers and jobs if those quotas were not met; that Mr. Trzaska and his patent colleagues objected and refused to participate in L'Oréal's quota scheme because it jeopardized their own licenses to practice law and subjected L'Oréal itself to potential sanctions; and that after Mr. Trzaska voiced his objections to his superiors, he was promptly fired because he refused to file patent applications for inventions that were not patentable. All these and the other averments in Mr. Trzaska's Amended Complaint, read deferentially as they must

17

be, lead to but one conclusion:  Mr. Trzaska had a reasonable belief that, as applied, L'Oréal's patent quota system was unlawful and in violation of a clear mandate of New Jersey public policy.

## ARGUMENT

I. **RULES OF PROFESSIONAL CONDUCT GOVERNING THE PRACTICE OF LAW, SPECIFICALLY THE RULES GOVERNING THE PRACTICE OF LAW BY PATENT LAWYERS, PROVIDE A SOURCE OF PUBLIC POLICY ENABLING IN-HOUSE LAWYER EMPLOYEES TO SUE THEIR EMPLOYERS FOR RETALIATION UNDER NEW JERSEY'S CONSCIENTIOUS EMPLOYEE PROTECTION ACT**

The District Court dismissed Mr. Trzaska's Amended Complaint on the ground that the Rules of Professional Responsibility that govern his practice of law do not apply to his job as a L'Oréal patent attorney. It based that conclusion on two principal holdings: first, it held that RPCs "have no bearing on Defendant's business practices." App. Vol. I at 013; and second, RPCs only "exist as a benefit for patent attorneys and those admitted to the Pennsylvania bar -- they do not benefit the general public." *Id.* at 104 n.2.

Neither holding is sustainable. The first may be quickly addressed. While it is true that L'Oréal is in the business of manufacturing and selling cosmetic products, it also is in the business of filing hundreds of patent applications each year with the PTO. Indeed, that was the *raison d'être* that Mr. Trzaska and his staff were on L'Oréal's payroll. Nor was that all. In packaging its cosmetic products, L'Oréal was not the least bit shy in using its pending patent applications to boost sales, and it used them as well to incentivize financial analysts and

19

investors to buy its stock.  Am. Cmplt. at ¶¶ 26 and 28, App. Vol II at 028.  Being in the patent business, L'Oréal was no more free to ignore or violate the PTO's regulations or the Pennsylvania Rules of Professional Conduct than was Mr. Trzaska, its in-house patent attorney and Head of Patents for the United States. Thus, both Mr. Trzaska and L'Oréal were subject to the same duties of candor and good faith (among other duties) that the PTO imposed on all patent applicants.  *See* 37 C.F.R. § 1.56 and 11.113;  *Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1324 (Fed. Cir. 2000) (applicants for patents, including their legal representatives, have the duty to prosecute patent applications in the PTO with candor, good faith, and honesty);  *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed.Cir.1995) (same);  *see also*  Pa. RPC 3.1 and 3.3.  The District Court was thus mistaken in holding that RPCs do not apply to L'Oréal's business -- at least to the extent its business included being a patent holder and applicant.

Nor was the District Court on firm ground in holding that the RPCs  "do not benefit the public."  The contrary is true.  As the Supreme Court emphasized 71 years ago:

> The possession and assertion of patent rights are issues of great moment to the public . . . .  A patent, by its very nature, is affected with a public interest. As recognized by the Constitution, it is a special privilege designed to serve the public purpose of promoting the Progress of Science and useful Arts . . . .

> The far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct, and that such monopolies are kept within their legitimate scope.

*Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 815-16 (1945) (internal quotation marks and citations omitted) (emphasis added).

Because of the "paramount interest" the public has in the "possession and assertion of patent rights," the Supreme Court has also recognized that "the relationship of attorneys to the Patent Office requires the highest degree of candor and good faith." *Kingsland v. Dorsey*, 338 U.S. 318, 319 (1949) (emphasis added). Moreover, "[b]ecause the PTO lacks the investigative and research resources to look behind representations by applicants and their counsel, it necessarily relies on those representations as to many facts that arise during the prosecution of patent applications, including experimental results obtained by the applicants, the state of the prior art, and the knowledge of persons of skill in the art in the field in question. Some of these facts will be uniquely in the hands of the applicant and, as a practical matter, undiscoverable by an examiner at the PTO. For those reasons, the PTO has imposed a duty on applicants to provide examiners with information that is material to patentability." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1309-10 (Fed. Cir. 2011).

21

In its own Rules of Professional Conduct, the PTO has stressed that "[a] patent by its very nature is affected with a public interest." 37 C.F.R. § 1.56(a) (emphasis added).  As a result, "[t]he public interest is best served, and the most effective patent examination occur when, at the time an application is being examined, the office is aware of and evaluates the teachings of all information material to patentability." *Id*.

In enacting and implementing its Rules of Professional Conduct, the Pennsylvania Supreme Court has likewise made it clear that lawyers are not merely automatons for their clients.  Rather, they have an overarching responsibility to the public and to the courts and administrative agencies before which they practice. *See*, *e.g.*, the Preamble to the Pa.RPC at [1]:  "A lawyer . . . is a representative of clients, an officer of the legal system and a public citizen having a special responsibility for the quality of justice" (emphasis added).  That "special responsibility"  includes, among other duties, assuring public agencies and courts that, as advocates, lawyers are acting in good faith, or conversely, not acting in ways that misuse the legal process.  *Thunberg v. Strause*, 682 A.2d 295, 300 n.4 (Pa. 1996).

Together, these authoritative statements from the United States Supreme Court and the RPCs promulgated by the PTO and the Pennsylvania Supreme Court

serve as a sharp rejoinder to the District Court's holding that RPCs only serve the interests of lawyers.   Far more paramount, particularly for practicing patent lawyers, is the overriding public interest served by those Rules.[2]   For that reason, the District Court's contrary ruling cannot stand.   We thus turn to a discussion of the specific RPCs at-issue in this case.

### A.    THE RULES OF PROFESSIONAL CONDUCT RELATING TO PATENT PRACTICE

Mr. Trzaska's objection to filing L'Oréal patent applications for proposed inventions that were not patentable was not made in a vacuum.   Practice before the PTO is highly circumscribed by Rules of Professional Conduct that govern the manner in which patent applications are presented to that Office for review.

Perhaps the most overarching obligation required of patent attorneys is the "duty of candor and good faith" set out in 37 C.F.R. § 1.56(a).   In relevant part, that regulation provides:

> Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office,

---

[2]   *See* Alex Long,  "Retaliatory Discharge and the Ethical Rules Governing Attorneys,"  79 U. Colo. Law. Rev. 1043, 1081 (2008) ("Unlike some professional codes of ethics, the ethical rules governing lawyers are not purely technical or self-serving in nature, but instead serve a public purpose.") (citing the New Jersey Supreme Court's decision in *Pierce v. Ortho Pharm. Corp.*, 417 A.2d 505, 512 (N.J. 1980)).

> which includes a duty to disclose to the Office all
> information known to that individual to be material
> to patentability as defined in this section. (Emphasis
> added.)

Moreover, "no patent will be granted on an application in connection with which fraud on the Office was practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct . . . . *Id*. (emphasis added).

Consistent with the duty of candor and good faith, the PTO regulations impose other strictures on practitioners. Among those are the following:

- 37 C.F.R. § 11.301, which makes it unlawful for a practitioners "to bring or defend a proceeding . . . unless there is a basis in law and fact for doing so that is not frivolous . . . ."

- 37 C.F.R. § 11.303, which makes it unlawful for a practitioner to "(1) [m]ake a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law . . . [or] (3) [o]ffer evidence that the practitioner knows to be false."[3]

- 37 C.F.R.§ 11.18(1), which requires practitioners to certify, *inter alia*, that the statements contained in a patent application "are true," and which subjects to criminal penalties under 18 USC §1001 any person or entity who "knowingly and willfully falsifies, conceals, or covers up by any trick, scheme or device a

---

[3] Relevant here too is the following additional statement contained in 37 C.F.R.§ 11.303(3): "A practitioner may refuse to offer evidence that the practitioner reasonably believes is false."

material fact, or knowingly and willfully makes any false, fictitious, or fraudulent statements or representations . . . ."[4]

- 37 C.F.R. § 11.113, which requires practitioners who are "employed or retained by an organization . . . [and] knows that an officer, employee or other person associated with the organization is engaged in . . . a violation of law that reasonably might be inputted to the organization, . . . then the practitioner shall proceed as is reasonably necessary in the best interest of the organization." *Id.*[5]

- 37 C.F.R. § 11.201, which provides that, '[i]n representing a client, a practitioner shall exercise independent professional judgment and render candid advice . . . that may be relevant to the client's situation."

- 37 C.F.R. § 11.804, which provides that any violation of the PTO's Rules of Professional Conduct by a practitioner -- including "conduct involving dishonesty, fraud, deceit or misrepresentation," *id.* at (c) -- constitutes "professional misconduct" and which may result in exclusion or suspension

---

[4] As per sub-section (b)(i) of 37 C.F.R. § 11.18, patent applicants must also certify that they have not presented any paper "for any improper purposes, such as . . . to cause unnecessary delay or needless increase in the cost of any proceeding before the Office." *See also* 37 C.F.R. § 11.18(2)(iii) ("The allegations and other factual contentions [must] have evidentiary support . . . .").

[5] That is exactly what Mr. Trzaska did here. He brought to the attention of his superiors, the heads of Human Resources and the General Counsel of L'Oréal USA that he objected to the filing of patents that were not patentable. Am. Cmplt. at ¶¶56-65, App. Vol. II at 034-35.

from practice before the PTO, a reprimand or censure or such other terms as may be appropriate.  *See*  37 C.F.R. § 11.20.[6]

Augmenting the PTO's regulations are the Rules of Professional Conduct promulgated by the Pennsylvania Supreme Court.  Those rules also circumscribe Mr. Trzaska's practice as a Pennsylvania attorney.  In a rule analogous to 37 C.F.R. § 11.301, Pa.RPC 3.1 provides that  "[a] lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law . . . ."  Of that rule, the Pennsylvania Supreme Court has issued a stern warning and reminder to attorneys not to file  "frivolous"  actions or to  "abuse legal procedure."  *Thunberg v. Strause*, *supra*, 682 A.2d at 300 n.4 (referring to the Rule 3.1 and the official Comment to it).  So too the patent practitioner's duty of candor and good faith set out in 37 C.F.R. § 11.303 has a direct analog in Pa.RPC 3.3 ("Candor Toward The Tribunal").  Likewise, 37 C.F.R. § 11.804 has a corresponding provision in Pa.RPC 8.4, which provides that "attorney misconduct" includes any violation of

---

[6]   Another consequence of a practitioner's  "professional misconduct" includes the risk that not only will the patent lawyer be subject to discipline, but also that the organization he or she represents may be found culpable as well with the result that the underlying patent will itself be unenforceable.  *See  Molins PLC*, *supra*,  48 F.3d at 1178-80.

the RPCs and any conduct involving dishonesty, fraud, deceit or misrepresentation. And similarly, Pa.RPC 1.13 regarding a lawyer's representation of an organization tracks the PTO's regulations, 37 C.F.R. § 11.113, requiring a lawyer to perform his or her duties "in the best interest of the organization" when its conduct is called into question. As with 37 C.F.R. § 11.20, the Pennsylvania Rules for Disciplinary Enforcement provide for a range of potential sanctions against miscreant lawyers, including suspension and disbarment. *See* Pa.R.D.E. 204.

It is within the context of these federal and Pennsylvania Rules of Professional Conduct that Mr. Trzaska brought to light that L'Oréal's quota scheme, as applied, violated his own, his staff's and his employer's own responsibilities not to file patent applications with the PTO for inventions that were not patentable. Doing so directly implicated New Jersey's CEPA statute, to which we now turn.

### B.    <u>NEW JERSEY'S CEPA STATUTE</u>

In 1980, the New Jersey Supreme Court established a common law public policy exception to the at-will employment doctrine. It held that "an employee has a cause of action [in tort or contract or both] for wrongful discharge when the discharge is contrary to a clear mandate of public policy." *Pierce v. Ortho Pharm.*

27

*Corp.*, 417 A.2d 505, 512 (N.J. 1980).[7]  Six years later, as a statutory analog to a

*Pierce* common law suit, the CEPA statute was enacted.    N.J.S.A. 34:19-1 to 14.

Described at the time as "the most far reaching whistleblower statute in the

motion," *Mehlman v. Mobil Oil Corp.*, 707 A.2d 1000, 1008 (N.J. 1998) (quoting

a November 2, 1986 *New York Times* article), CEPA has been amended over the

years to expand its reach and scope.[8]  It also has been judicially applied to bring

---

[7]  In reaching that result, the *Pierce* court stated: "Employees who are professionals owe a special duty to abide not only by federal and state law, but also by the recognized codes of ethics of their professions." 417 A.2d at 512.  It went on to distinguish codes that "contain an expression of public policy" (and which can support a wrongful discharge claim) and those codes that "serve only the interests of the profession" (such as the Hippocratic oath on which Dr. Pierce unsuccessfully sought to ground her own claim).  *Id.*

[8]  For example, in January 2006, the Act was amended to modify the phrase "fraudulent or criminal" found in Section 3c.(2) of CEPA, N.J.S.A. 34:19-3c.(2).    Before the amendment, CEPA prohibited retaliation against an employee who "[o]bjects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes . . . (2) is fraudulent or criminal."    As amended, the phrase "fraudulent or criminal" now includes "any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor . . . or any governmental entity" (emphasis added).

This amendment is not unimportant to Mr. Trzaska's claim here.  In his Amended Complaint, he specifically referenced and, *inter alia*, based his CEPA claim on N.J.S.A. 34:19-3c.(2).  Am. Cmplt. at ¶71, App. Vol. II at 037.

within its coverage in-house attorneys like Mr. Trzaska, *Parker v. M&T Chemicals, Inc.*, 566 A.2d 215, 221 (N.J. Super. App. Div. 1989) and other "watchdog" employees like him. *Lippman v. Ethicon, Inc.*, 119 A.3d 215 (N.J. 2015). In another example of its breadth, the New Jersey Supreme Court has construed CEPA to apply to not just violations of that State's public policies, but the clearly established public policies of other jurisdictions as well. *See Mehlman*, *supra*, 566 A.2d at 1016-17.[9]

In light of its broad public purpose and reach, CEPA "is considered remedial legislation entitled to liberal construction, its public policy to protect whistleblowers from retaliation by employers having been long recognized by the courts of this State." *Lippman*, *supra*, 119 A.2d at 224. *Accord Estate of Roach v. TRW, Inc.*, 754 A.2d 544, 550 (N.J. 2000) ("CEPA is supposed to encourage, not thwart, legitimate employee complaints. Consistent with CEPA's broad remedial

---

[9] The *Mehlman* Court refused to construe CEPA narrowly as defendant Mobil argued. 707 A.2d at 1015. It held that an employee could bring a CEPA suit if the public policy under consideration was clearly established by the law of a jurisdiction outside New Jersey -- in that case the law of Japan. "We would not impute to the Legislature so parochial an objective as to protect New Jersey employees retaliated against for taking risks to protect only New Jersey citizens. In our view, the purposes of CEPA are no less served by recognizing a cause of action for a New Jersey employee whose employer retaliated against him or her for objecting to a violation of a clear mandate of public policy that threatened to harm citizens of other states or countries." *Id.* at 1016-17.

29

purpose, we are satisfied that the Legislature did not intend to hamstring conscientious employees by requiring that they prove in all cases that their complaints involve violations of a defined public policy."); s*ee also Abbamont v. Piscataway Twp. Bd. of Educ.*, 650 A.2d 958, 971 (N.J. 1994) (The Legislature enacted CEPA to "protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct").

As relevant here, Mr. Trzaska has pled that he was fired by L'Oréal in retaliation for his objection and refusal to participate in its quota scheme under which he and his staff were required to file patent applications for L'Oréal with the PTO without regard to their merit.  That brought into play five sections of the CEPA statute, see  Am. Cmplt. at ¶71, App. Vol. II at 037, relevant portions of which are set out below:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:
>
> a.  Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation

30

involving deception of, or misrepresentation to . . . any governmental entity . . .

(2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud . . . any governmental entity . . .

c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to . . . any governmental entity . . .

(2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud . . . any governmental entity.

(3) is incompatible with a clear mandate of public policy concerning the public . . . welfare . . . .

N.J. Stat. Ann. § 34:19-3

## C.    THE CASELAW CONSTRUING THE CEPA STATUTE

Now thirty years old, the CEPA statute has been construed many times by New Jersey courts.  In doing so, they have issued a number of landmark rulings that have particular applicability to Mr. Trzaska's CEPA claim.  Among them are two we have mentioned earlier: *Parker* and *Lippman*.  In *Parker*, the Appellate Division of the Superior Court approved a CEPA suit brought by an in-house

31

patent attorney who, like plaintiff Trzaska, also served as his former employer's Director of Patents.    Having objected and refused to participate in a company scheme to copy and return confidential trade secrets of a competitor, Mr. Parker was reprimanded, demoted and constructively discharged.    In response to his suit, M&T Chemicals, his former employer, sought to dismiss his complaint on the ground that CEPA contained an "implied exemption" for in-house attorneys.  566 A.2d at 219.    Rejecting that argument and relying on the Code of Professional Ethics adopted by the Supreme court of New Jersey, the Court ruled: "We . . . will not read in-house attorneys out of the Act's protection." *Id*. at 221.    It likewise discounted M&T Chemical's argument that to allow plaintiff Parker's CEPA suit to proceed would result in the impermissible disclosure of confidential attorney-client communications.    Quoting Justice Cardozo, the Court stated:

> [t]here is a privilege protecting communications between attorney and client.    The privilege takes flight if the relation is abused.    A client who consults an attorney for advice that will serve in the commission of a fraud will have no help from the law. He must let the truth be told.

*Id*. at 221, *quoting Clark v. United States*, 289 U.S. 1, 15.[10]

---

[10]    This Court reached a similar result in  *Kachmar v. Sungard Data Systems, Inc.*, 109 F.3d 173 (3d cir. 1997).    There, citing  *Parker* with approval, the Court rejected defense arguments that an in-house attorney could not bring a Title VII retaliatory discharge suit against her former
**Continued**

*Lippman* is no less significant. It held that "watchdog" employees, whose duties included ensuring compliance with relevant standards of care and who had knowledge that their employers might be deviating from those standards, could not be carved out of CEPA's coverage. "By its very terms, the statutory cause of action created by CEPA applies equally to all employees." *Id*. at 217.

Like Dr. Lippman, whose duties included providing his medical opinion about the safety of his employer's pharmaceutical products and was fired for

---

employer. *Id*. at 181. It also rejected a defense argument that allowing the suit would result in disclosure of confidential attorney-client communications. *Id*. Those concerns, the Court held, could not act to bar the suit but could be addressed on remand by the District Court without vitiating the lawsuit. *Id*. at 181-82.

Similarly on point is the Montana Supreme Court's decision in *Burkhart v. Semitool, Inc.*, 5 P.3d 1031 (Mont. 2000). In that case, much like this one, the plaintiff was an in-house patent attorney. He sued his former employer under a Montana statute similar to CEPA claiming he was fired for refusing to file fraudulent patent applications with the PTO. Citing *Parker* with approval, the court rejected the employer-defendant's argument that the attorney-client relationship barred the action. *Id* at 1038-39. Like this Court's decision in *Kachmar*, the *Burkhart* Court also rejected the argument that the suit was barred by the potential for disclosure of confidential attorney-client communications. Relying on Rule 1.6 of the Montana Rules of Professional Conduct -- which mirrors Rule 1.6(c)(4) of the Pennsylvania Rules of Professional Conduct -- the Court concluded: "Rule 1.6 contemplates that a lawyer may reveal confidential attorney client information, to the extent the lawyer reasonably believes necessary, to establish an employment-related claim against an employer who is also a client." *Id*. at 1041.

advocating the recall of a product he believed to be dangerous, Mr. Trzaska was also a "watchdog." Not only was he a L'Oréal patent attorney, for ten years leading up to his being fired he was also the Head of Patents for L'Oréal in the United States. Am. Cmplt. at ¶13, App. Vol. II at 026. As such, he was responsible for ensuring L'Oréal's compliance with applicable standards of care with respect to the filing of patents with the PTO. Am. Cmplt. at ¶¶16-20, App. Vol. II at 027. He thus can no more be carved out of CEPA's protection than could Dr. Lippman.

Many other New Jersey decisions have relied upon codes of conduct to support CEPA claims. Consider, for example, the following: *State v. Davis*, 840 A.2d 279, 288 (N.J. Super. App. Div. 2004) (" . . . we have held that there is nothing incompatible between the Code of Professional Ethics and New Jersey's Conscientious Employee Protection Act that would serve to bar a former in-house attorney's suit for monetary damages against his former client employer" (*citing Parker*); *Sunkett v. Misci*, 183 F. Supp. 2d 691, 717 (D.N.J. 2002) ("The Rules of Professional Conduct can supply a clear mandate of public policy under CEPA") (citations omitted); *Estate of Roach v. TRW, Inc.*, *supra*, 754 A.2d at 610 (holding that an employer's own internal code of conduct was a sufficient statement of public policy to warrant plaintiff's CEPA suit, the Court noting: "The overall

34

objective of CEPA is to protect society by shielding employees who expose illegal or deleterious activities in the workplace"); *Weiss v. Carpenter, Bennett & Morrison*, 672 A.2d 1132, 1141 (N.J. 1996) ("Our own precedents demonstrate quite clearly that the Rules of Professional Conduct, at least to the extent they are designed and interpreted to protect the public interest, express a clear mandate of public policy"); *Baldwin v. City of Atlantic City*, 2015 WL 5009746 at *8 (N.J. Super. App. Div. Aug. 19, 2015) (non-precedential) (citing *Parker* for the proposition "in house attorneys are permitted to file CEPA claims"); and *Morris v. Greitzer and Locks of New Jersey*, 2009 WL 2525452 at *9 (N.J. Super. App. Div. Aug. 20, 2009) (non-precedential) (approving a lawyer's CEPA claim based on New Jersey's Rules of Professional Conduct).[11]

---

[11] Two other decisions deserve mention. The first is *Hitesman v. Bridgeway, Inc.*, 93 A.3d 306 (N.J. 2014). In that case, because it was too vague and had no "substantial nexus" to the defendant employer's practices, the Court held that the American Nursing Association's Code of Ethics could not support the plaintiff's CEPA claim. *Id.* at 310. In doing so, however, the Court made it clear that professional codes of ethics can provide a source of public policy if a "substantial nexus" is shown between a code and the defendant's policies or practices. *Id.* Mr. Trzaska's is such case, as was *Estate of Roach* referenced above in the text. The other decision is *Tartaglia v. UBS Painewebber, Inc.*, 961 A.2d 1167 (N.J. 2008). This was a *Pierce* common law wrongful discharge suit brought by an in-house lawyer against her former employer. The plaintiff claimed she was fired in retaliation for raising conflicts of representation issues with her employer that she reasonably

*Continued*

## II.   PLAINTIFF'S AMENDED COMPLAINT STATES A VALID CEPA CLAIM FOR RETALIATORY DISCHARGE

The District Court failed to accord Mr. Trzaska's Amended Complaint the deference it was due on a motion to dismiss. That was reversible error. As this Court has stated many times, in ruling on a motion to dismiss the District Court was "required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant." *Folgia v. Renal Ventures Mgt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014). Consequently, to defeat L'Oréal's motion all Mr. Trzaska was obliged to do was satisfy the "plausibility requirement" of *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). And, as this Court said eight years ago, that standard "does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements." *Phillips v. City of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008).

---

believed needed to be avoided. Reversing the grant of summary judgment against her, the Supreme Court of New Jersey held that the Rules of Professional Responsibility constituted a source of public policy that allowed her suit to proceed. *Id*. at 1083-84.

Here, the facts averred in Mr. Trzaska's Amended Complaint more than satisfy the "plausibility requirement." Before detailing those averments, we pause to address a legal question: under CEPA, must Mr. Trzaska allege an actual violation of the law or public policy by L'Oréal, or does he only need to show a "reasonable belief" that such a violation has occurred?

**A.    THE STANDARD IS NOT WHETHER AN EMPLOYER HAS COMMITTED AN ACTUAL VIOLATION OF LAW OR PUBLIC POLICY, BUT WHETHER A CEPA PLAINTIFF HAS SHOWN A REASONABLE BELIEF THAT A VIOLATION HAS OCCURRED.**

The answer to the posed question derives from the CEPA statute itself and the caselaw construing it. In sections 3 a. and c. of CEPA, N.J.S.A. § 34-19-3 a. and c., the Legislature used the term "reasonably believes" to describe the evidence a plaintiff needs to plead to support a CEPA claim under those provisions of the Act. And in case after case, New Jersey courts have reiterated that the statute means what it says. "Accordingly, it is not the plaintiff's burden to show that the defendant actually violated the law, rule, regulation or other authority cited, but only to demonstrate that he or she had a reasonable belief that such a violation occurred." *Hitesman v. Bridgeway, Inc.*, supra, 93 A.3d at 318. *Accord Estate of Roach*, *supra*, 754 A.2d at 613 (holding that plaintiffs suing under sections of 3 a. and c. of CEPA are not required to prove that the alleged violations constitute an

actual violation of law, "but only that the employee 'reasonably believes' that to be the case").

Moreover, having a "reasonable belief" that a violation has occurred does not carry with a requirement that a violation *must* have occurred. *Dzwonar v. McDevitt*, 828 A.2d 893, 901 (N.J. 2003) ("We do not agree . . . that a [CEPA] plaintiff must allege facts that, if true, actually would violate [a] statute, rule or public policy"); *accord Morris v. Greitzer and Locks of New Jersey*, *supra*, 2009 WL 2525452 at *8.

A good example of this last point is Judge Orlofsky's decision in *Mazza v. George Yelland*, Inc., 161 F. Supp. 2d 376 (D.N.J. 2001). In that case, a bookkeeper, Amy Mazza, refused to make entries in her employer's books that she believed would be used by the employer's external accountant to file fraudulent income tax returns. The employer gave her the choice to make the entries or to resign. She resigned.

Defending the resultant CEPA constructive discharge claim, her employer argued that Mazza could not make out a successful claim because she could not show that it actually violated any law or policy. To support that argument, the employer emphasized that the book entries challenged by Mazza ultimately did not

appear in the employer's books and that the impermissible deductions were not claimed in the employer's tax return.

Yet still Mazza's CEPA claim survived a motion for summary judgment. The Court reasoned, citing the New Jersey Supreme Court's decision in *Estate of Roach*, *supra*, and this Court's decision in *Blackburn v. United Parcel Service, Inc.,* 179 F.3d 81, 93-4 and n.4 (3d Cir. 1999), that "CEPA does not require that the activity complained of . . . be an actual violation of a law or regulation, only that the employee 'reasonably believes' that to be the case." *Id.* at 379.

Judge Orlofsky also rejected the employer's argument that Mazza's bookkeeping complaints were mere " 'speculation' about a possible future violation of the law" -- a violation that never came to fruition. *Id.* at 381. Rather, he observed that it would be an "absurd result" to deny CEPA protection to an employee who, "by refusing to comply with an illegal order, entirely prevent[ed] the commission of a public wrong." *Id.* at 380.

## B.    THE FACTUAL ALLEGATIONS PLED IN PLAINTIFF'S AMENDED COMPLAINT AMPLY SATISFY CEPA'S REASONABLE BELIEF STANDARD

The District Court came to the conclusion that Mr. Trzaska's Amended Complaint failed to sufficiently plead that he had a reasonable belief that L'Oréal's quota system violated the law or a clear mandate of public policy. App. Vol I at

014.    It read the Amended Complaint as evidencing  "nothing more than [plaintiff's] disagreement with his employer over the propriety of a quota for patent applications." *Id*.  at 015.    That, we respectfully submit, was far too parsimonious a reading of what Mr. Trzaska had pled.

To begin with, it was not L'Oréal's quota system *per se*  that Mr. Trzaska opposed.  Rather, it was its wrongful application that required him and his staff to file a set number of patent applications with the PTO without regard to the patentability of each of the underlying "inventions."  It was on that basis that he and his staff objected and refused to participate in L'Oréal's patent scheme.  Am. Cmplt. at ¶¶33-37, 51-57 and 65-67, App. Vol. II at 029-31, 033-34 and 035-36.

Filing patents with the PTO that were not patentable was a breach of the mandatory duties of candor and good faith that Mr. Trzaska and L'Oréal owed to the PTO.  Am. Cmplt. at ¶¶17-19, App. Vol. II at 027.  It likewise was a breach of those duties that Mr. Trzaska was required to follow as a Pennsylvania lawyer. Am. Cmplt. at ¶¶17 and 20, App. Vol. II at 027.  ███████████████████

███████████████████████████████████████████████

███████████████████████████  ████  ██████████████████

███████████████████████████████████████████████  ███

███████████████████████████████████



Nor was that all Mr. Trzaska pled to support his allegation that he reasonably believed that L'Oréal was using its quota system for an unlawful purpose.  As another example, he averred that he and his staff were told their "careers and/or continued employment" were in jeopardy if the quota was not met. Am. Cmplt. at ¶46, App. Vol. II at 032.

And second, he pointed out that even some of L'Oréal's own scientists admitted that their "inventions" were not patentable.  Am. Cmplt. at ¶57, App. Vol. II at 034.

41

L'Oréal's reaction to Mr. Trzaska's objections and refusal to participate in its quota scheme was not long in coming.  In October 2014, he told his superiors that he and his staff were unwilling to file patents with the PTO that were not patentable.  *Id.*  Two weeks later, he was summoned to a meeting with the head of HR for Research and told he had two options:  either leave the company with a severance or  "get back to work."   Am. Cmplt. at ¶59, App. Vol. II at 034.  His request to meet with the head of HR for the United States was then blunted and, on December 8, 2014, he was told by L'Oréal's General Counsel that he was being fired  "because he had threatened to begin legal actions if his concerns were not addressed"  and, because of that, "his position was no longer needed."  Am. Cmplt. at ¶64, App. Vol. II at 035.  Days later, L'Oréal advertised an opening for his job. Am. Cmplt. at ¶68, App. Vol. II at 036.

In light of these factual allegations and the legal standards governing motions to dismiss, it cannot reasonably be said -- as did the District Court -- that Mr. Trzaska's objection to L'Oréal's quota scheme was simply a disagreement over the implementation of "measurable yearly goals" and L'Oréal's efforts to "encourage[ ] its employees, including attorneys, to meet those goals."  App. Vol. I at 016.  It was far more than that.  And had it read Mr. Trzaska's Amended

Complaint in the light most favorable to him, the District Court would not and should not have granted L'Oréal's motion to dismiss."[12]

---

[12] It was also untenable for the District Court to conclude that Mr. Trzaska "must show past or imminent wrongful activity" to succeed on his CEPA claim. App. Vol. I at 014. As we have shown in the text at Section II.A., that is not the law. Besides which, Mr. Trzaska did plead that L'Oréal's quota scheme, as applied, required him and his staff to breach their ethical and legal duties because they were being required to file patents without regard to the merits of the underlying inventions. Am. Cmplt. ¶¶55, 57 and 65-67, App. Vol. II at 034, 035-36. Nor was the District Court correct in concluding that Mr. Trzaska's case lacked merit because L'Oréal never "demanded or ordered that Plaintiff or others relinquish their professional judgments or obligations." App. Vol. I at 016. That too reflects a misunderstanding of what Mr. Trzaska pled, *see* Am. Cmplt. ¶¶55 and 57, App. Vol. II at 034, and the reasons why he and his staff refused to participate in L'Oréal's quota scheme. *See* ¶¶33-37 and 65-67 of the Am. Cmplt., App. Vol. II at 029-31 and 035-36. That they had to choose between complying with their professional responsibilities or submit to L'Oréal's scheme strengthens and not weakens Mr. Trzaska's case.

## CONCLUSION

For the reasons stated, the District Court's order dismissing Mr. Trzaska's Amended Complaint should be reversed and the case remanded to the District Court for proceedings consistent with this Court's opinion.

RAYNES McCARTY

By: _____

Harold I. Goodman, Esquire
Daniel Bencivenga, Esquire
1845 Walnut Street
20th Floor
Philadelphia, PA 19103
215 - 568 - 6190
Attorneys for Plaintiff-Appellant Steven J. Trzaska

Dated:   June 2, 2016

44

## Certificate of Compliance
## With Filing Requirements

1.  This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because the brief contains 9,799 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because the has been prepared in a proportionally spaced typeface using Word in 14-point Times New Roman.

3.  Pursuant to the Third Circuit Local Appellate Rule 31.1( c), I hereby certify that the text of the electronic brief is identical to the text in the hard, paper copies of the brief.

4.  Pursuant to the Third Circuit Local Appellate Rule 31.1( c), I hereby certify that a virus detection program was performed on this electronic brief/file using Symantec AntiVirus software and that no virus was detected.

5.  In conformance with Third Circuit Local Appellate Rule 46.1(e), Harold I. Goodman and Daniel Bencivenga are members of the bar of this Court.


_____
Harold I. Goodman, Esquire

Date:    June 2, 2016

45

## CERTIFICATE OF SERVICE

I, Harold I. Goodman, hereby certify that on June 2, 2016 I caused the foregoing Brief and Volume I of the Appendix to be filed via ECF and served via the Court's electronic notification system upon all filing users associated with this case. I additionally caused one copy of the Brief and Volume I of the Appendix to be served upon the following counsel by U.S. First Class Mail:

Christopher R. Carton, Esquire
George Peter Barbatsuly, Esquire
Laura Scully, Esquire
K&L GATES LLP
One Newark Center
10th Floor
Newark, NJ 07102

*Attorneys for Appellee L'Oréal USA, Inc.*

Eric A. Savage, Esquire
Littler Mendelson, P.C.
One Newark Center
8th Floor
Newark, New Jersey 07102

*Attorney for Appellee L'Oréal, S.A.*


Harold I. Goodman, Esquire