UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
NO. 15-3810

STEVEN J. TRZASKA,

Appellant,

vs.

L'OREAL USA, INC.;
L'OREAL, S.A.

Appelle.

Transcript from the audio recording of the oral argument held Wednesday, November 16, 2016, at the United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania. This transcript was produced by James DeCrescenzo, a Fellow of the Academy of Professional Reporters, a Registered Diplomate Reporter, an Approved Reporter of the United States District Court.

BEFORE:

THE HONORABLE THOMAS L. AMBRO

THE HONORABLE MICHAEL A. CHAGARES

THE HONORABLE JULIO M. FUENTES

APPEARANCES:

HAROLD I. GOODMAN, ESQUIRE
higoodman@raynesmccarty.com
RAYNES, McCARTY, BINDER, ROSS & MUNDY
1845 Walnut Street, Suite 2000
Philadelphia, Pennsylvania 19103
215.568.6190
Counsel for Appellant

ERIC A. SAVAGE, ESQUIRE
esavage@littler.com
LITTLER MENDELSON
900 Third Avenue, 8th Floor
New York, New York 10022
212.583.2695
Counsel for Appellee L'Oreal, S.A.

CHRISTOPHER R. CARTON, ESQUIRE
christopher.carton@klgates.com
K&L GATES
One Newark Center, 10th Floor
Newark, New Jersey 07102
973.848.4000
Counsel for Appellee L'Oreal USA, Inc.

Page: 3


THE COURT: Our last case of this morning, number 15-3810, Trzaska V L'Oreal USA, Inc. and L'Oreal, S.A., Messrs. Goodman, Savage, and Carton.

Whenever you're ready, sir.

MR. GOODMAN: May it please the Court, with the Court's permission I would like to reserve three minutes of my time for rebuttal.

THE COURT: That's fine.

MR. GOODMAN: Thank you.

THE COURT: You certainly may.

MR. GOODMAN: In this case the district court dismissed Mr. Trzaska's CEPA whistle-blower claim for two essential reasons, neither of which commend themselves to this court.

The first is that the Rules of Professional Conduct, as promulgated by the United States

Patent and Trademark Office, and the Rules of Professional Conduct promulgated by the Supreme Court of Pennsylvania, do not apply to L'Oreal because it is a cosmetics company.

And to directly quote my opponent's brief in support of the insupportable, they say L'Oreal is a beauty company, not governed by any ethics rules governing the legal profession.

Let me explain why that can't be true and never has been true. First, it is not just a cosmetics company. It sets quotas every single year as to the number of patents that we file worldwide with government agencies --

THE COURT: Could those quotas have been satisfied without violating any Rules of Professional Conduct?

MR. GOODMAN: We don't know. We can say this: To the

extent that the defendants are saying
that Mr. Trzaska was not ordered by
anyone to file a frivolous patent
claim, to the extent he himself did
not file a frivolous patent claim --
and that is some justification for
affirming the district court -- it is
completely inconsistent with every
CEPA ruling of the New Jersey Supreme
Court and virtually every district
court in this circuit.

THE COURT: So you're
saying that in fact frivolous or
unwarranted patent claims were filed
by Mr. Trzaska and/or his office?

MR. GOODMAN: No. I'm
saying --

THE COURT: On behalf --

THE COURT: Or that he was
told to do so.

THE COURT: Or that he was
told to do so on behalf of L'Oreal?

MR. GOODMAN: No. I'm
saying he was not, based upon the

complaint. But I am saying that isn't the standard.

The standard as set by the New Jersey Supreme Court, literally interpreting CEPA, is that you have a reasonable belief that a violation of law or regulation is occurring. You do not wait for the unlawful conduct to take place.

Every court that has considered that has so held. For example --

THE COURT: Wait a minute. Just for the heck of it, I've got a chicken and egg problem here. You're saying that there was a violation of law taking place but you don't have to wait for the violation of law to take place.

MR. GOODMAN: Precisely. And as a matter of fact, though it is analogous, that's precisely what this court held in Wiest v. Lynch about three years ago, albeit interpreting

Section 806 of the Sarbanes-Oxley law.

THE COURT: But isn't it really simpler than that? He's called in, in October or whenever it was, and they're saying you haven't met your quota. And he's saying whoa, we've got some problems here. And I've got some ethical concerns about putting forth patent claims when my people are telling me in this region that we have problems. And so there may be issues.

And then, supposedly, somebody says to him no, no, you're supposed to, you're supposed to meet the quota, dude, and he doesn't.

Then that seems to be a conceivable violation. They're telling him go forward, and in effect ignore the Rules of Professional Conduct. I thought that's what you were saying.

MR. GOODMAN: And that is

what the complaint, read directly, and all of these other inferences do say. This is not just some sort of agreement where people sit down and say, you know, maybe we should have a quota on the number of patents we file each year, and someone is for it and someone may be against it. That is not what this complaint pleads.

It pleads the quota was set, and that if you do not meet it, then you must file frivolous, nonpatentable claims. And what he does, what he does, based on the complaint, is go to his bosses. He is chief of patents for L'Oreal U.S.A.

He supervises a staff. And the staff isn't just going to be governed by numbers games, but by ethical responsibilities, both to the PTO and to the Pennsylvania Supreme Court.

And he says this is wrong.

It will breach my ethical responsibilities. And since you are the patent applicant, it violates your responsibilities as well.

THE COURT: That doesn't seem to get you under CEPA. It certainly didn't satisfy the district court. The district court focused on there not having been a public policy that was violated.

MR. GOODMAN: Well, that was the first point that I was beginning to address, so let me go back to that.

The court first found that because L'Oreal is a beauty company it is not subject to the Rules of Professional Conduct. That's just not the law.

Imagine filing hundreds and thousands of patent applications with the PTO. You are the applicant, Mr. Trzaska is your lawyer. Is it even conceivable that you can violate

or ignore those rules and somehow say they're just a beauty company.

Let me just draw to your attention two cases which make the point marked by about 16 years. Parker, the appellate division's decision in 1989 on behalf of the patent lawyer who claimed I'm not going to take part in a trade secrets violation.

And what the court did there is conclude that the Rules of Professional Responsibility apply. What was his company? It wasn't a law firm or a law-related company. It was a chemicals company.

And then in 2003, albeit in a pierce whistle-blower case, the Supreme Court of New Jersey green lights a pierce claim. And who was the plaintiff? A young woman who was practicing securities law for PaineWebber. PaineWebber isn't a law firm or a legal firm, it's a

financial services company.

THE COURT: Let's assume you have a very solid argument there. One of the procedural issues here is -- relates to L'Oreal, S.A.'s motion to dismiss the appeal. How do you respond to that? Now they brought a motion to dismiss under what, 12(b)(5) initially?

MR. GOODMAN: Yes.

THE COURT: And the court sua sponte dealt with it under 12(b)(6)?

MR. GOODMAN: That's exactly right, Judge. It did two things on the same day. It granted the 12(b)(6) motion, and as to L'Oreal, the parent company, S.A., it denied its motion as moot.

Now, let's just take a look at this court's jurisprudence and, in fact, I mentioned Wiest already because it's so much a point I'm going to return to it.

The order is not just related. It was the precisely same order that dismissed both claims, even though the parent company didn't file the (b)(6) motion.

We took an appeal of that (b)(6) order and opinion. In the caption we didn't just include L'Oreal USA, we included the French parent company.

THE COURT: But it's not mentioned separately in your briefs, though. They don't appear in your issues presented, in the argument, it's just not, they're not dealt with separately.

MR. GOODMAN: Judge, this was filed as a motion to dismiss. We spent a ten-page brief responding to it. Judge Fisher for the court deferred it to this court, and then we did bring it to the court's attention in the opening pages of our brief.

Any notation -- I mean just think for a moment. We're doing a nine-page brief citing this court's case law, saying that the reason that it was appealed is for one reason only, 12(b)(6). Both defendants were implicated by that. Both sides were named as parties. This court named them as parties.

And, finally, in late July -- there was no prejudice -- both companies filed briefs. And, quite frankly, when you look at the brief of the parent company, the last five pages are addressed to a 12(b)(6) motion.

There's just no way, under this court's case law, that that motion to dismiss can be granted.

THE COURT: So what happened with regard to the actual appeal? Because supposedly 3(c) 1(b), I guess it is, says that you need to specify the actual judgment.

MR. GOODMAN: This court's decisions have held that if orders are related, if there was a clear intent to bring that up as to both parties, and there has been no prejudice, that rule is satisfied. We made that abundantly clear. There's an underlying motion to dismiss by Judge Pratter of the underlying suit.

Finally, there's a Rule 59 motion that's belated, which is denied. The appellant only moves to appeal the 59. This court held the two orders, albeit the second on the underlying motion to dismiss wasn't appealed, that they were interconnected.

We have here identical, not interrelated orders, entered the same day by the same judge who denies the French company's motion for one reason: It's deemed to be moot.

I'm not reaching that

issue. I'm --

THE COURT: What was the claim against S.A.? Because Mr. Trzaska was an employee of USA, right?

MR. GOODMAN: He claims in his complaint that he was an employee of both. Judge Wigenton ruled without differentiating the discrete claims against the parent or the U.S. subsidiary that all the claims, in fact, should be subject to Rule 12(b)(6) dismissal.

And when one looks at the complaint, the amended complaint, you will see that these mandatory quotas, meant to be followed regardless of whether an underlying invention was patentable, was set by the parent company.

You will see that when Mr. Trzaska sat down to verbalize and object having to do this under the pressure of compliance with numbers

rather than his ethical duties and the ethical duties of the company, the CFO of the parent company said no. And moments after that, weeks, he was fired.

THE COURT: Can you address how we could come to a conclusion that there was a violation of a public policy here?

MR. GOODMAN: Yes.

THE COURT: Why -- what L'Oreal was doing --

MR. GOODMAN: Yes. Absolutely. The public policy here --

THE COURT: Well, what in fact was the doing? The contention is that they were filing very frivolous -- asking for the filing of frivolous patent applications.

MR. GOODMAN: That they had a plan, Judge Fuentes, and that plan violated the ethical responsibilities that fell not only on Mr. Trzaska but

on the company.

THE COURT: I understand. What was the plan?

MR. GOODMAN: The plan was file a set number of patents each year.

THE COURT: When I saw it got up to 500 and what --

MR. GOODMAN: Five hundred globally.

THE COURT: Why does L'Oreal want 500 patent applications filed within a period of one year?

MR. GOODMAN: They do it continuously, and we pled this in the complaint.

THE COURT: I understand.

MR. GOODMAN: In order to secure a financial advantage. They want to be able to have it incentivized so that financial advisors, buyers of their stock, buyers of their products will see this.

THIRD CIRCUIT, 11/16/2016

THE COURT: So maybe the public policy is a fraud on the market.

MR. GOODMAN: No. This isn't a securities case, which would raise separate questions. This is simply whether or not --

THE COURT: I thought you said securities purchasers.

MR. GOODMAN: No, but that's -- you asked me why, why are they doing that, and that's one reason. And that reason trumped, for example, ethical considerations that fell squarely on the shoulders of Mr. Trzaska.

THE COURT: Is L'Oreal a publicly traded company?

MR. GOODMAN: Yes. In Paris.

THE COURT: All right.

THE COURT: What's the effect of having -- there's a quality control group that vets these things,

right? Don't they have a say in this?

MR. GOODMAN: Yes, they do. Again, take a look at the amended complaint in light most favorable to the pleader. In this case, they were subject to two outside reviews, as pled in the complaint, and that showed that the quality of the inventions were very poor. And so now the rock hit the road -- that's not a very good metaphor. In any event -- I'll forget the metaphor.

What happened was, and this is where the pressure was put on the lawyers and their staff. The pressure was you got to get it filed. The scientists have got to move quickly. There's a pleading in this case that says the scientists disagreed. They weren't able to comply with this.

THE COURT: Judge Wigenton didn't have a problem with any of

that, but she seemed to focus on there being no violation of a public policy.

MR. GOODMAN: But, your Honor, here's where that is wrong. It is statutorily wrong and it goes against every precedence set from the New Jersey courts and this court.

A, the statute doesn't say you have to prove an actual violation. Again and again the statute says a reasonable belief that one has been filed. That's Dzwonar, it's Hitesman, and it's Estate of Roach.

And it was earlier this year that Judge Chesler, faced with exactly the same argument in a case involving a lawyer, concluded that the lawyer doesn't have to prove an actual violation, just a reasonable belief that one is taking place.

And the language he used and then this court used is critical,

and I'd like to read it. This is what Judge Chesler said as to whether you have to prove an actual violation or a reasonable one, which, after all, is all the statute requires, Section 3(a) and 3(c).

He wrote as follows: "It furthers the purpose -- I'm sorry. This is this court's decision in Wiest. And in that case the argument was under the Sarbanes-Oxley law you have to prove an actual violation rather than a reasonable belief.

This is what the court wrote. "Section 806 protects an employee's communication about a violation that has not yet occurred, as long as the employee reasonably believes that the violation is likely to happen. The corporate code of silence not only hampers investigations, but also creates a climate where ongoing wrongdoing can occur with virtual impunity."

When the Supreme Court of New Jersey restates with the very question you put to me, Judge Fuentes, do you have to prove an actual violation or not, it said no. It has said it every time its had to consider it.

Indeed, last year in the Lippman case, Lippman vs. Ethicon, which dealt with the whole notion of watchdog employees exempted from CEPA. It said absolutely not. That would be for a legislature to have to do. All they have to do is have a reasonable belief that something is amiss. And that's the public policy here, and that's why the district court was wrong.

THE COURT: Could you articulate that public policy?

MR. GOODMAN: Yes. Going back 71 years to the Supreme Court's decision in 1945 in Precision Instruments. It wrote that patents

serve and are a public interest, that it is imbued with a public interest, because of the monopolies that they create.

That is 71 years of consistent case law. The PTO rules explicitly state that patents are infused with the public interest. The Rules of Professional Conduct of the Supreme Court of Pennsylvania say the same thing.

I don't have to remind the court of my duty today under Rule 3.1 and 3(b)(3) to be candid, to draw to your attention cases that help me and don't. Mr. Trzaska had that duty. This is a public purpose. It is absolutely wrong to suggest otherwise. And just taking a look at the case law, it is the only conclusion that can be drawn.

Because if you say, as the district court did, that the Rules of Professional Conduct only benefit me

and my colleagues as lawyers, or Mr. Trzaska and his colleagues as patent lawyers, you disabuse every notion that we have of lawyers' responsibility.

Why have Rules of Professional Conduct? Those rules apply not just to Mr. Trzaska, to which he follows to a T., they also applied to his company, L'Oreal, which was the applicant.

And if the applicant -- think about this -- had informed the PTO that we have this quota policy, and that policy or practice is that we are going to require the filing with you of patents that involve innovations which are not patentable, I would suggest that the PTO would say we need to know that.

THE COURT: Well, you know, now you're getting into an area where you're just having a policy disagreement with the employer,

right?

MR. GOODMAN: No, sir. No, sir. This is not just sitting down and --

THE COURT: I don't believe that the complaint says that the employer told the attorneys go out and file frivolous patent applications, right?

MR. GOODMAN: Wrong. That is exactly what the amended complaint pleads, that this was not just sort of some quota system --

THE COURT: L'Oreal told them to go out and file frivolous patent applications?

MR. GOODMAN: The amended complaint states to a certainty that it developed a quota system and that as a result of that quota system, patent lawyers were required, if necessary, to file frivolous patents, applications with the PTO.

And Mr. Trzaska, a seasoned

patent lawyer who worked for them for more than ten years, was the chief of patents in the United States, objected. And the record is absolutely clear that he objected.

THE COURT: Is it the case, then, that an attorney who was fired for refusing to file a patent application that he or she believes is baseless has a CEPA claim?

MR. GOODMAN: If -- under that set of facts, absolutely, yes. The Rules of Professional Conduct -- think about it as a Rule 11 motion in court, for example. Suppose a lawyer knowingly filed something with fraud, knowing that it wasn't supported by fact or law. That's why we have Rule 11.

THE COURT: That's true of a lawyer in a law firm who doesn't want to file a complaint because he doesn't believe that the complaint has merit, now gets fired and has a

CEPA claim against the law firm?

MR. GOODMAN: It depends on the facts. If he was compelled by his employer, the law firm, to file something that was frivolous, certainly there's vicarious liability there, and if he was ordered to breach his or her ethical responsibilities, my answer to your Honor is yes.

This statute, passed in 1986, was hailed as the most rigorous whistle-blower law in the United States. And if you just look at a decision several months ago in the Baldwin case, the city solicitor of the city of Atlantic City claimed that the pay-for-play rules, which he was supposed to oversee, were being violated. The city claimed, no, you haven't proven that.

And the court had to decide the very question you've asked me. Do you have to prove the actual

violation? And the court said it's the Baldwin case, which we've cited, no, you don't. The Supreme Court of New Jersey has made it clear, if you've got a reasonable belief. That's all that Mr. Trzaska needed to prove. It is, in fact, what he pled, and he ought to have the opportunity to go forward.

I see my time is up for now. We ask the court to reverse and remand the case.

THE COURT: We'll get you back on rebuttal.

MR. GOODMAN: Thank you.

Mr. Savage.

MR. SAVAGE: Good morning, your Honors. If it please the Court, Eric Savage on behalf of L'Oreal, S.A.

THE COURT: If you could run -- I assume you're here on the motion to dismiss the appeal. Go through the Polonski factors, if you

would, that were noted by Mr. Goodman.

MR. SAVAGE: Of course. There are several factors that are discussed in the Polonski and related cases.

THE COURT: Well, first, is there a connection between the specified and unspecified orders?

MR. SAVAGE: There was not. These are two orders filed, again, with respect to separate defendants with separate attorneys.

THE COURT: But they were issued the same day and relied exclusively on the same opinion. In effect, a -- I mean talk about a surprise, a 12(b)(5) motion became a 12(b)(6) dismissal.

MR. SAVAGE: It became that in the sense that the district court ruled that if Mr. Trzaska could not make out a case against the actual employing entity here in the United

States, he certainly was not going to be able to make out a case against the French corporate parent of that employing entity. But the cases, the claims are different --

THE COURT: But what does that merits have to do with a suggestion under 12(b)(5) that there was improper service of process?

MR. SAVAGE: Well, that was a separate -- the motion addressing the service of process is different than the 12(b)(6) motion.

But there were clearly differences between the two companies and the relationship of Mr. Trzaska with USA, which is his actual employer, versus S.A., which is the corporate parent of his employer.

Those are different issues, these are different defendants, which it would be no surprise to anybody, would be asserting very different lines of attack against the claimant.

THE COURT: To be clear, the plaintiff is not an employee of yours.

MR. SAVAGE: He is not. He is an employee of USA.

THE COURT: Okay.

MR. SAVAGE: Not of S.A. So that's one factor is the connection.

The second faction is the intent to appeal. And I would respectfully submit that words matter, that actions matter, that we live in -- when we appear in front of your Honors we are bound by the rules.

And the chronology establishes that plaintiff deliberately did not appeal as to S.A. He did not file a notice of appeal as to S.A. within the 30 days required by 28 U.S.C. 2107 and Rule 4(a)(1)(A).

THE COURT: Are you still

contained in the caption of the pleadings?

MR. SAVAGE: The caption of the pleading, Judge, is just the cover of the book; it doesn't cover what's inside.

THE COURT: But it does show intent, does it not?

MR. SAVAGE: No, it does not, Judge, because the notice of appeal says I am appealing the order, singular, order, singular. And as required, he attached the order from which he was appealing. He did not include the order addressed to S.A. If I remember my Latin, which I don't, you have the old maxim of inclusion of one is the exclusion of others.

So that when he included the order addressed to USA and he deliberately did not include the S.A. order, he therefore excluded it. He had the opportunity to file a motion

to amend the notice of appeal. That would be required to be filed by December 30. That wasn't done.

THE COURT: Do you claim any prejudice at all?

MR. SAVAGE: Absolutely. We have --

THE COURT: What was the prejudice?

MR. SAVAGE: Well, the prejudice is that, frankly, starting with the somewhat slippery way in which service of the summons and complaint was done from the very get-go.

THE COURT: Were you denied a full opportunity to brief the issues?

MR. SAVAGE: Well, we were not, but, your Honor, that's somewhat circular. We filed this motion back in April, and the court decided to hold it until the argument of the full appeal, which was certainly

entirely within the court's province.

THE COURT: You filed a motion for 12(b)(5).

MR. SAVAGE: We filed a motion for 12(b)(5), and then we filed this motion. Back in April we were eventually told it would be dealt with as part of the plenary appeal, which is obviously the court's discretion.

But at that point, once we were told that, I think it would be irresponsible, if not malpractice, for us not to go forward with the appeal and address what we're going to say.

THE COURT: The clerk of court sent a notice of appeal to S.A.'s counsel shortly after the appeal was filed, requesting he enter his appearance. He then waited five months to file a motion to dismiss the appeal. That's a long time.

MR. SAVAGE: It is a long

time, but there is no time limit, there is no mandatory limitations period.

THE COURT: And you would have a great case if within those five months you were denied an opportunity to brief the appeal. But you weren't.

MR. SAVAGE: Well, although, your Honor, I don't know that the courts -- we can only speculate what the court's decision would have been as far as whether to hold our motion in connection with this plenary appeal if we had filed in April -- in February as opposed to April.

THE COURT: I don't know how other circuits are, but, I mean, this circuit, from way back when, has, on procedural matters, tried to get to the merits. In Polonski it says -- or in Sulima our jurisprudence liberally construes

notices of appeal.

MR. SAVAGE: But there was no notice of appeal filed here. And again --

THE COURT: Liberally construes; in other words, Polonski was pretty much, quite similar to this case.

MR. SAVAGE: Well, but the difference here, and we go back to the Elfman case. And when counsel says that the two orders are connected, that's really misconstruing the authority.

Where cases are related, such as to pick up the notion of the liberality of construing notices of appeal, those are where there is a logical connection in sequence.

So, for example, a decision denying a motion to reconsider picks up the summary judgment motion on which it was based.

The summary judgment motion

decision picks up the discovery motion which underlies it. These are two different defendants, two different lines of attack on the case, two different series of issues.

THE COURT: No matter what, you think you're going to win on the issues because this person is not an employee of S.A..

MR. SAVAGE: We do think that. But we don't think we should be required to, or that plaintiff has properly brought us into the case such that we would be obligated to engage in the type of discovery.

And the thing is, Judge, and I keep coming back to this, even if counsel thought that, and somehow says well, everybody should have known that I really meant to include S.A. In the appeal and that somehow your Honors and we should somehow have intuited or understood clairvoyantly that he meant to

appeal --

THE COURT: Actually it's an easy intuit.

MR. SAVAGE: But respectfully, Judge, it isn't, because we are entitled to rely on the papers that the appellant files. And when he --

THE COURT: You're correct. If federal rule of appellate procedures 3(c) 1(b) is applied to the T, but there are exceptions to that.

Polonski gives you the factors you look to. And I'm unsure how you have those factors tilt in your favor, even though on the merits you may have a great case.

MR. SAVAGE: We may have, but we don't think that we should be required to be involved in that because there was no intent to appeal. Even if the plaintiff thinks that the final case-ending decision

dismissing his appeal against S.A. was baseless, an abuse of discretion, call it what you will, to quote Sam Spade at the end of The Maltese Falcon, "A man is supposed to do something about it."

And you're supposed to -- it would have taken plaintiff another five minutes to change the notice of appeal to say I'm appealing from the orders of the district court entered on October 30. He didn't do that. That was deliberate.

THE COURT: You are absolutely right that he didn't do it. And the question is do we still consider it under the factors that Polonski gives us?

MR. SAVAGE: Respectfully, Judge, he has not given your Honors the power, he has not invoked the jurisdiction of the court such as to bring us within the jurisdiction of this court, and thereby mandating

dismissal of the appeal as to S.A.

THE COURT: Sounds like you're still making a 12(b)(5) argument.

MR. SAVAGE: I'm not making a 12(b)(5) argument, Judge. The 12(b)(5) argument may or may not have been sustained by the district court. But the fact is that the order that dismissed us, whether it was under 12(b)(5), 12(b)(6) or whatever, was something that Mr. Trzaska was required to do. He was required to put us on notice, he was required to put your Honors on notice. He did none of that.

THE COURT: All right.

MR. SAVAGE: Thank you, your Honors.

THE COURT: Thank you. We'll hear from Mr. Carton.

MR. CARTON: May it please your Honors, good morning. I'm Christopher Carton, K&L Gates. I

represent the L'Oreal USA entity, Mr. Trzaska's employer.

Your Honors, the issue I think that requires the most focus --

THE COURT: Let me just at the outset let you know what my concern is. Maybe you could see this as a possible Rule 56 case after discovery.

But to have, as a matter -- a 12(b)(6) on a motion to dismiss, a person who claims in a complaint that he was terminated because of his opposition to a company policy to file X number of quotas when he thought that to do so would be violative of certain Rules of Professional Conduct, how does that survive a 12(b)(6) motion?

MR. CARTON: Well, it did, your Honor, as we saw from the district court's opinion, which was --

THE COURT: I should say

how does that not survive a 12(b)(6) motion?

MR. CARTON: For the reasons stated by the district court so succinctly, your Honor. If your Honor looks -- the main issue which I would direct the court's attention to is, when we're talking about 12(b)(6) we're talking about the complaint.

What's been grossly overstated by counsel in papers and then again today, but it's not in the complaint and it was not in the motions to dismiss below, this case was never about the contention that L'Oreal has a policy that attorneys are to file patents whether they're frivolous or not.

THE COURT: But at this point I have to consider only what's in that amended complaint; is that correct?

MR. CARTON: Exactly. And it's silent, your Honor. It does not

THIRD CIRCUIT, 11/16/2016

say -- it says L'Oreal had a quota system that Clark group, where Mr. Trzaska was, had to file 40 patents. It does not say that the -- L'Oreal encouraged -- that that policy included you file these patents whether they are frivolous or not.

There is nothing in the complaint that suggests expressly that L'Oreal ever said that attorneys are to file it no matter what, that they impliedly said that, that they suggested it or they condoned it or that they would ever accept it.

THE COURT: But counsel, I mean, they did say if you don't, your employment's going to be at risk.

MR. CARTON: Right.

What they said was there is a quota system -- remember, the quota system is not just for the attorney, it's for the patent team, which includes researchers; inventors,

whose job it is to make inventions for patents; laboratory heads in France; and the patent team of lawyers.

These are all directed to the patent team. And it was a company telling a patent team of -- that starts with inventors, you're an inventor, you have to invent and we're going to create metrics for you to do so. That's what it was.

THE COURT: What is the purpose of a quota system?

MR. CARTON: The quota system is, again, coming from the complaint, Judge Fuentes, it's plaintiff's recognition that there was a business justification to the quota system.

It's not in dispute in the case; it's in the complaint. Plaintiff says that L'Oreal had business reasons why it's important for it to be, have patentable

products, have patented products.

THE COURT: I suppose, to be perceived by the public that the product that they're selling is cutting-edge stuff.

MR. CARTON: The contentions in the complaint are that somehow it's perceived to be more of a -- the products are viewed to be in a different light when they're viewed to be -- carry these -- that they're scientifically developed and proven.

THE COURT: Right. But that's exactly counsel's complaint, though. He's pretty much saying that these patents that I am asked to file are meritless.

MR. CARTON: No, I don't think counsel has said that, your Honor.

THE COURT: Or I have a reasonable belief that they are meritless, the patents.

MR. CARTON: Well, it's

THIRD CIRCUIT, 11/16/2016

very interesting, your Honor.
Because if you look at the complaint, counsel never says he filed a frivolous patent. He came in 2004 --

THE COURT: No, what he's saying is that, don't put me in a position where I need to -- we have problems and problems with regard to certain patent issues exist that we think make these particular applications not patentable. And the implication is just get it done. Just do it.

And that sounds like what you're telling somebody is to violate his own Rules of Professional Conduct of the state and also the rules that relate to the PTO system.

MR. CARTON: Well, your Honor, the contention that -- what comes from Mr. Trzaska in the complaint was a conversation in which he said to a superior, I'm not going to file patents that are not

patentable.

THE COURT: Sounds like a pretty good thing an employee should say.

MR. CARTON: Absolutely.

But what I'm saying is, that was not -- there's no response recorded in the complaint from the company saying yes, you will. The only response are other things unrelated to that conversation --

THE COURT: Just a month later they can him.

MR. CARTON: That they continued the quota, system. Right. But, your Honor, what he does not say in the complaint -- to say that -- there is no expression in the complaint whatsoever that L'Oreal, that this was a policy, that it would encourage or condone. There's no expression.

And if it's going to be implied, your Honor, this has

basically been turned into a fraud, similar to a fraud complaint, meaning that what's just been said -- and it's not said in the complaint -- is that L'Oreal was effectively ordering its patent counsel to perform fraud on the PTO by filing frivolous patents.

And if it has become now a fraud case rather than a case about quotas, then the rules for fraud of pleadings, Johnson vs. New Jersey Higher Education, Capano v. Tribeca, Young vs. Irvington.  It's clear in a CEPA case, if you're going to allege fraud-type allegations, you must plead the fraud.

THE COURT:  Your challenge to the complaint wasn't on that basis, was it?

MR. CARTON:  Sorry?

THE COURT:  Your challenge to the complaint was not on that basis.

MR. CARTON: Well, the challenge to the complaint, your Honor, was when you put up the -- because as the complaint is pled, the only thing that's alleged is -- the question is what is the conduct at issue? What's the crime? This is a whistle-blower. What is he whistle-blowing?

If you read the complaint, what is alleged is L'Oreal had a quota system.

That's what this case --

THE COURT: Well, he's also alleging that the patent system exists to benefit the public.

MR. CARTON: Correct.

THE COURT: And how is it not in the public's interest to safeguard a well-functioning patent system? In effect he's saying that if I file certain applications for certain of these patents it will violate the rules that exist with

regard to applications. And I don't want to do that. I feel very uncomfortable doing that.

MR. CARTON: The specific rules at issue, the RPCs at issue, your Honor, dealing with filing frivolous actions, where all 71 years of precedent, the cases have been talked about, expressions of public policy, relate to patents, meaning patents are in place.

THE COURT: But you don't think those rules are established and in force for the protection of the public?

MR. CARTON: The fact that lawyers who are appearing in the PTO must file papers that they certify are nonfrivolous or not for an extension of the regular law, no.

I think that in that context, that particular rule would exist for the private interests of the PTO and for the attorneys

THIRD CIRCUIT, 11/16/2016

practicing in it. Because, Judge, the public expression of public policies patents is when a patent is issued and then we wield that patent, we go around, certainly public interest.

These are patent applications that, according to Mr. Trzaska, might very well be unpatentable and by his claim frivolous. If they are, in fact, that, they will not become patents. The applications will be denied and they won't be patents.

So really what the issue is, is if -- it's a clogging of the PTO with applications that will ultimately be -- that are not meritorious and will not be, result in patents. So that 71 years of law is focusing on different things.

THE COURT: Can you be fired for refusing to violate your ethical obligations as a legal

professional?

MR. CARTON: Could you be fired for -- yes. If it matched up precisely and there was allegations that he was told in some way, an express allegation that he is to violate an obligation, absolutely, your Honor.

THE COURT: No, but the point is can Mr. Trzaska be fired for refusing, for what he believes are his ethical obligations as a legal professional?

MR. CARTON: If --

THE COURT: Not what you believe, what he believes.

MR. CARTON: Could he be fired for what he believes?

THE COURT: If he believes, and has some basis for belief, that to file patents that he thinks are in certain cases not patentable, that it would violate his ethical obligations as a legal professional, can he be

fired for that?

MR. CARTON: No, your Honor. He would not be able to be fired for that if he expressed it. He didn't express it that way. He did not say I have patents in front of me that I cannot file.

He'd been there for ten years. This quota system existed when he arrived in 2004. It existed until 2014. He filed patents year over year and signed off of them for ten years under that system without any issue or tension or pressure of any kind.

The only thing that changed in 2014 was an allegation by Mr. Trzaska that L'Oreal instituted a program to improve the quality of patents and that therefore he got less of them. So the tension, your Honor, was really between the quota system and the number he was receiving. It was a business

tension.

THE COURT: Was it to improve --

MR. CARTON: It's a fallacy to say it was a tension with the RPCs.

THE COURT: Maybe I missed it in my review, but was it to improve the quality of the patents or to improve the numbers of the patents that are filed?

MR. CARTON: The quality. So the contention in the complaint was in 2014 L'Oreal undertook a program to improve the quality. As a result it required more from inventors --

THE COURT: As I was seeing in my reading, the numbers were going up dramatically, in a steep, very steep curve, like about 200 to 300, up to 500 per year.

MR. CARTON: They had been that for many years. Worldwide, your

Honor, is what you're thinking of.

THE COURT: If they're so worried about the quality, why are they putting a number on it then?

MR. CARTON: Well, because again, there is -- these are business metrics and if you're going to have inventors and they're going to work in Clark and they're going to be a requirement of 40, and you've got a certain amount of people, there is nothing improper for a business to put -- to project metrics to say you're inventors, you need to invent 40 patents amongst all of you in a year. That's what was done.

THE COURT: Actual patents are displayed on the products itself. Patent pending, for example.

MR. CARTON: Either pending or a patent, yes.

THE COURT: Can you just give us a little -- you made a point of saying that a patent is a product

of a whole team. And I know that in reading the papers there's folks who vet these things.

First off, I guess that he had never -- there's nothing in the complaint about, I guess, any patents being denied that he put through, right?

MR. CARTON: There's nothing about that as all. As I said, your Honor, for ten years he'd been operating under a 500 worldwide -- the numbers are all in the complaint -- this quota system. And there was never tension whatsoever expressed about RPCs or anything, which is very odd if you think about it, because according to plaintiff the patents were much less quality all during that time.

He says in 2014 we undertook to improve them and as a result they got less. So for ten years he, according to him, received

lower quality patents, signed off on them for ten years, says he never filed a frivolous one and that there was no tension in the RPCs.

The irony of why I think he is not deserving of inferences from your Honor that he's asking, he's asking for an inference that L'Oreal had a policy to mandate that people file frivolous patents when he didn't say that in the complaint.

And he's asking for that inference when he's basically said that I got better quality patents in 2014 and all of a sudden I had the creation of tension with the RPCs. That was a business tension that was created. It was in the number now. It was harder to reach because he received less internally.

THE COURT: The problem that I have is -- take an example. There's a deal; the company wants this loan to go through. And the

attorney comes to him, he's supposed to give a legal opinion that there are no violations of law. And he realizes that with regard to this particular -- or no violations of other agreements.

And he realizes that there is a violation, if you do this particular deal, of another contractual arrangement. And the company says to him look, this deal is life or death for the company. We have to get it done. You need to give the opinion.

And the person says I have an ethical obligation to act as a -- according to these rules. He has a good case, doesn't he?

MR. CARTON: Absolutely, your Honor. And if it was pled that way it would be a different story. It wasn't pled here. Nobody came to him and said this is a life or death, you get this done. All that was

said -- the most that comes off this complaint is a quota system was in place and he said to somebody I'm not going to file patent quotas -- patents that aren't patentable, and there was no response. If --

THE COURT: No response until a month later when he was fired.

MR. CARTON: Right. After there were meetings regarding -- he was clearly having issues about the quota system at this time, your Honor, clearly. Those are business issues that we're able to defend in this case.

THE COURT: Wasn't there an expression that the patent applications that he was asked to file were meritless applications?

MR. CARTON: I'm sorry, your Honor?

THE COURT: Meritless applications.

THE COURT: Was there an issue as to whether there were meritless applications?

MR. CARTON: There's no issue, there's no -- the complaint is silent to there being -- the merit of any patents at all. He does not say he had sitting on his desk meritless patents, he never filed them, or that he ever made it clear L'Oreal -- and was told you file a meritless patent. That's the problem.

THE COURT: I guess I have to go back and look at the complaint again, but you're saying that the only assertion made was -- his objection was to the numbers of patent applications. I'm asked to file 500 applications. I can't do that. It's too much.

MR. CARTON: He didn't even go that far. He was operating under a quota system and his only affirmative acts that he took himself

at all were to say to somebody once I'm not filing applications that I don't feel are patentable.

THE COURT: Well, wait a minute now. That's a different story. That's not objecting to the numbers, that's saying I'm not going to file applications that cannot be patented.

MR. CARTON: Right.

THE COURT: Isn't that meritless?

MR. CARTON: Well, he doesn't say he was ever told to file patents. So to say that, your Honor, it's similar to the Young case or, for example, Cabana Wear.

In Young was the police officer who felt that he was an investigator and he -- in part of an investigation of another police officer should he take a drug test when he felt it was not warranted, would be illegal to require an

officer who crashed a car or something to take a drug test, and he didn't do it. And he was ultimately fired. And he said the reason I was fired is I did not take the drug test.

And what the court pointed out is -- it was a CEPA claim. You were never, you never pled that you were asked to take the drug test.

That's what's missing here. Mr. Trzaska has not pled he was ever told, before he made that expression, file a patent that's not patentable. He just said it.

It would be like billable hours in a law firm. Many law firms institute billable hour requirements and they say lawyers must bill 2,000 hours. That's a lot of hours. And if you don't have any work to do, you can't do it.

It would be akin to a law firm putting that in place and

saying -- the law firm is the equivalent of L'Oreal -- we're putting associates -- partners must bill 2,000 hours. L'Oreal said inventors, patent teams, 40 patents.

THE COURT: That's a slippery slope you just -- so if you can't bill 2,000 hours because there isn't enough work, in effect you're being told you have to bill 2,000 hours, so, therefore, you have to make it up?

MR. CARTON: Right. The inference is this, your Honor. And this is where it comes down on the billable hour analogy. If a law firm says there's 2,000 hours required, is it to be implied that that means, by having that rule in place, that people are to do whatever's necessary, including breach the RPCs and commit fraud to get there? And what I'm saying is it -- absolutely not.

There must be something
pled where the law firm in that case
said you get there whether you got
the work or not. If you file
frivolous -- you pad your hours or
not. That's what's missing here.
All we have --

THE COURT: What did he say
the given reason for his firing is?

MR. CARTON: Your Honor,
there were clearly -- there was a new
2014 -- he was told that his position
was being eliminated because, in
fact, he was holding a position at
the time of U.S. patents and then
also there was another part of the
world that was, he had control over.
That had been a long-standing issue
in the company of his position. And
he was terminated.

And, clearly, your Honor,
he also, he did threaten when he --
he had problems with the quota
system, no doubt. And he -- there

was in the complaint evidence that somebody he claims told him because he had threatened to file a lawsuit, that was also a factor.

But, your Honor, I'm over my time.

THE COURT: Yes.

MR. CARTON: But I would just emphasize and encourage your Honors to please review the complaint and look for what would matter here, and I think change things, which would be something from L'Oreal to suggest that, in fact, he was encouraged, implied, expressly told to file patents if they were frivolous. It does not exist and it changes the landscape tremendously of this claim.

THE COURT: All right. Thank you very much.

MR. CARTON: Thank you, your Honor.

THE COURT: Mr. Goodman.

MR. GOODMAN: Very briefly, in response to Mr. Savage. Why on earth would we file a notice of appeal on an order that says, as to the French entity, your motion, 12(b)(5), is moot?

We are dismissing you from the case on 12(b)(6) grounds, which you didn't move. We filed a notice of appeal pointing to the 12(b)(6.) We identified both companies. They had plenty of chances to file a motion before that five-month period.

THE COURT: What was it, just a slipup that somebody didn't reference that particular order pertaining to S.A.?

MR. GOODMAN: I don't think so. Why would I be here on an order that says --

THE COURT: Maybe you wouldn't be here if you had specifically noted that particular

order pertaining to S.A., right?

MR. GOODMAN: That's correct. That's absolutely correct.

THE COURT: That's all I'm saying.

MR. GOODMAN: We clearly satisfy those standards. And all I'm simply saying is the argument that we didn't attach a separate order that says it's moot as to you on 12(b)(5) grounds hardly is fatal.

One other point. There's been an assumption here that Mr. Trzaska was the employee only of the USA entity. Paragraph 9 of the amended complaint at appendix 26. "At all material times plaintiff was an employee of defendant L'Oreal USA and L'Oreal, S.A." That's in the amended complaint.

Now, as to the underlying merits, let me come back to what the complaint does say. The complaint says that things happened in 2014

that hadn't happened before; namely, outside evaluators concluded that the inventions were of poor quality. And then there was this tension. Do we follow a quota system?

And I'm glad my opponents finally used the word "quota," because if you read the brief, they use the word "goals," as if it was a race or sex case for some reason. It was a quota system. And he never had an opportunity or a need to question it until they said file them or else.

And what the "else" is is laid out in the amended complaint at paragraph 46, appendix 32. "Plaintiff and his patent attorney colleagues were informed that if a 2014 target of 40 filed patent applications was not met there would be consequences which would negatively impact their careers and/or continued employment."

And then he speaks with the

CFO of the French company and he says these are my ethical responsibilities. And what happens? Judge Ambro, you answered that question. As pled shortly thereafter, out of the blue, he is fired.

My final point. Counsel would seem to suggest this is a business disagreement and therefore it's not CEPA protected. I've already answered that, I think.

I ask you to take a look at paragraph 73 of the amended complaint. It's about the second-to-last one. It avers that both defendants were aware that the underlying practices about which Mr. Trzaska complained were unlawful. Let me read that paragraph in full.

THE COURT: We'll take a look at that.

MR. GOODMAN: 73.

THE COURT: Yes.

MR. GOODMAN: And for all these reasons -- and thank you for the time you've given all of us today. I appreciate it.

THE COURT: No, thank you very much. Thank you to all counsel for very-well-presented arguments and we would ask if you would have a transcript prepared of this oral argument, split the cost 50-50, and no urgency necessarily in getting it to us.

MR. GOODMAN: Yes, sir.

THE COURT: Thank you very much.

CERTIFICATION

I, JAMES DeCRESCENZO, a Fellow of the Academy of Professional Reporters, a Registered Diplomate Reporter, Certified Realtime Reporter, an Approved Reporter of the United States District Court and the Court of Common Pleas, hereby certify that I have truly and accurately transcribed this recording to the best of my ability.

I further certify that I am neither attorney nor counsel for, not related to nor employed by any of the parties to this action; and further, that I am not a relative or employee of any attorney or counsel employed in this action, nor am I financially interested in this case.

James DeCrescenzo
Fellow of the Academy of Professional Reporters
Registered Diplomate Reporter
Certified Realtime Reporter
Approved Reporter of the United States District Court and the Court of Common Pleas